Okay, our next case is a consolidated matter, Ameren v. Illinois Commerce Commission at Owl. The numbers of these consolidated matters are 410-0962, 410-0976, and 411-0075. For the appellant, we have Mark Witt and also Eric Robertson. For the appellee, James Wegging and Eric Robertson. Have I missed anybody? All right, now I know that there's been some talk about who will be arguing and the amount of time that each person will be given. And have you cleared that with the bailiff? Okay, and which attorneys are going to be arguing? Mark Witt for appellant. Okay, and? Robertson for the Illinois Industrial and Consumer. Okay. Okay, if we're clear on the time, then the bailiff will, of course, use the yellow and red lights. And you're familiar with those, so you'll know when you're running out of time and then when your time has expired. Having said that, either Mr. Witt or Mr. Robertson, please proceed, whoever's going first. Your Honor, may I please report? My name is Mark Witt. I represent the Ameren Illinois Company. I would like to reserve four minutes of my time for rebuttal and two-and-a-half minutes to respond to the Commission and IIEC. I'm going to spend most of my time talking about the depreciation reserve issue, and that issue really hinges on the interpretation of two statutes, one of which the Commission violated, the other of which it misinterpreted. Those two statutes, of course, are Sections 9-11 and 10-101 of the Public Utilities Act. I'll talk about Section 9-11 first. This statute says that rate base may include, quote, the value of such investment which is both prudently incurred and used and useful in providing service. Now, page 39 of the Commission's order in this case, or I'm sorry, it's page 39 in the Joint Appendix, page 30, I believe, of the order, the Commission interprets 9-11 as, quote, requiring the Commission to make sure rate base does not exceed the utilities investment value it uses to provide service. The Commission then goes on to talk about how contemporaneous increases and decreases to rate base are not severable items. Now, it's important to note that the Commission's own staff does not agree with this interpretation, nor should it. The Commission's interpretation suggests that its decision-making in this case was backwards, that it made a decision to change its rule and then looked for a statute to support that decision. Section 9-11 simply does not mandate how the Commission must determine the value of rate base. It only says that investments cannot be recovered in rates unless the utility shows two things, that the investment is prudently incurred and that it's used and useful. With respect to value and how the Commission can go about doing the evaluation, that's the subject of a different statute, specifically Section 9-10. And that statute says that the Commission, quote, shall have the power to ascertain the value of the property of every public utility in this state and every fact which in its judgment may or does have any bearing on such value, end quote. So, Section 9-11 says nothing at all about valuation, and Section 9-10 simply says the Commission can consider whatever facts it deems necessary in making that determination. It certainly doesn't mandate the Commission go about the evaluation exercise in any certain way, let alone the manner in which it went about evaluation exercise in the case below. When we read Sections 9-10 and 9-11 together, it simply reflects the legislature's intent that the utility show that it spent money and what that expenditure was, the cost or the value, that the decision to spend that money was reasonable, i.e., prudent, and the money was spent for something that is used and useful to provide service to customers. Now I'll talk about Section 10-101. And this statute... Well, before you leave that, why does that preclude considering the depreciation? It doesn't preclude the Commission from considering depreciation or making some determination of how depreciation should be calculated. The problem here is that the way the Commission went about the exercise constituted a drastic change from its past practice on that very subject. It justified the change by saying that Section 9-11 required it to do the evaluation the way that it did, when in fact, in prior cases, the Commission rejected that argument and said, no, 9-11 doesn't require us to make this adjustment and we're not going to do it. In four cases, the most recent four cases preceding our case, that's what the Commission said. That's what the Commission continued to say after we filed our case and when those prior cases were on appeal. Mr. Wegging argued those cases and said, 9-11 doesn't bind this Commission to make the adjustments that the parties in that case advocated. But when we got to Ameren's case, the Commission reversed course and said, lo and behold, 9-11 binds us to change our prior interpretation of our administrative rule. That's what throws us into Section 10-101, which gives the Commissioner authority to adopt, alter, and amend rules, and it can do that in two ways. Typically, it will have a rulemaking proceeding, or if it wants to change a rule in the context of a contested case, it can do that. But if it does that, that has to be clearly indicated, and those are the words in the statute, clearly indicated at the beginning of the proceeding, and the proceeding can then commence. No such notice was provided in our case. As I indicated, at the time we filed our case, and while the case was being litigated, all the way up until the order was issued in our case, the Commission's position was that Part 28740 of its administrative rules did not allow the adjustment that was ultimately adopted in our case. By changing its rule in the context of a contested proceeding without prior notice, the Commission violated Section 10-101. The violation is, this type of violation has been addressed by the Illinois Supreme Court, in particular the BPI case, BPI-1 from 1989. That case involved what had been characterized by the Commission as an order where the court found, in fact, it was a settlement agreement, where the Commission and some other parties agreed that rather than set rates on a traditional one-year basis under the test year rules, it was going to set rates over a five-year period and allow a two-step increase. Now, the Commission didn't have a problem with the idea of setting rates over five years. It actually found some merit in that approach because it provided rate stability, and there were all sorts of customer benefits that could be gleaned from that arrangement. The problem the court had was that it was done in a manner that violated the Public Utilities Act. The Commission rules said rates will be set for one year. But in the case, they decided, let's go ahead and set them for five years. The court said, you can't do that. It violates the Act. If you want to set rates for five years, you have to follow 10-101, which means have a rulemaking or let the parties know this is what you intend to do. Everybody's on notice, and things can proceed accordingly. And the case was remanded on that basis. And as I indicated, no such notice was provided here. There has been a... Was, however, the position, theory, change advocated for, argued for during the hearing? In BPI-1? Or, well, BPI-1... Before the... There's a difference between the Commission coming up with it on its own and it being presented as an argument. That's what I mean. Your Honor, I'm not sure what the genesis... Whose idea that was. There were a series of... I believe that there were some hearings in the case, but ultimately the case was resolved in a single amended order. The Commission characterized it as an order. The court said, this isn't an order. This is really just a settlement agreement. That was one of the other problems the Commission had. The decisions are supposed to be based on record evidence. And in BPI, the Commission decision wasn't. It was really just a black box sort of settlement that had been cobbled together, signed off on some parties but not others, leading to yet another problem, which is that stipulations can't be imposed on non-signatory parties, as the Commission tried to do in that case. So, again, and it goes back to this case, it's about process. The Commission has authority to make all sorts of determinations about valuation, how it's going to do that. But it can't simply disregard its own rules, reinterpret those rules without providing notice that it intends to do so, and doing it in a way that prejudices parties. I'd like to talk for just a moment about the Mississippi River decision and progeny, which is often cited for the proposition that Commission decisions aren't race judicata. That's true only to a very limited extent. If you look at Mississippi River, that was a case where the Commission made a finding that a company was a public utility. They made that finding in 1952. When the case got to the Supreme Court, the Commission can't find we're a public utility because in 1949 they hauled us in for a proceeding to find out if we were a utility, and they said we weren't. So based on that finding in 1949, you can't say in 1952 we're now a public utility. The Court said that's not right. That prior decision doesn't preclude the Commission from making a different decision later based on different facts. The Court went on to find, however, that in fact the company was not a public utility based in part on a 20-year history of the Commission not acting to bring this company within regulation. So without conceding that the Commission could be right, I'm not asking you to do that, but let's assume for the moment you'd say they may have been right. That may be a legitimate interpretation if they had engaged in the rulemaking process and given us advance notice of this. That's correct, Your Honor. Very different issues. Issue one is, was this a correct decision? And certainly the standard of review, I know I have a high hurdle there, facts are entitled to deference and all of that. And I don't expect to win that issue, frankly. We obviously believe the Commission got the accounting wrong. We explain all that in our brief. But even if they were right, the fatal problem here is the way in which it was done. It's the problem identified in BPI where the Court criticized the Commission for putting expediency over fairness in principle, and that's what was done here. I see that my red light is on. If there are no more questions, I will take a seat. Okay. Thank you very much. Thank you. Counsel, please proceed. May it please the Court. My name is Eric Robertson. I'm with the law firm of Leaders, Robertson & Kahneman in Granite City, Illinois, and I represent the Illinois Industrial Energy Consumers, who are a group of large manufacturing and industrial customers served by Commonwealth Edison. I'm sorry, served by Ameren. Ameren originally proposed rates, in this case, that would have increased delivery service costs for each of the Ameren Utilities DS4 rate classes, which include most of the IIC companies in this case, by almost 57%. These were the largest increases proposed by Ameren for any rate class in this case. That is one of the reasons we are in the case. The proposed increases, however, for many IIC customers were worse than those for the DS4 class as a whole. The DS4 class has four subclasses. The subclass containing the most IIC companies would have been subject to increases of 541% on the Silco system, 760% on the Illinois Power System, and 1,270% on the CIPS, or Central Illinois Public Service Company System. The biggest factor by far driving these increases were changes in the expense, which is the subject of IIC's appeal. IIC proposed two allocation approaches for the pure tax. One, retain the current plant and service allocator that had been used for many, many years. Or two, use a composite allocator based partly on plant and service and partly on KWH delivered to give recognition of the fact that there were other factors besides plant and service that may be affecting this tax amount. IIC appeals the Commission's change in the method of allocating the pure tax among Ameren's customer rate classes from an allocation based on plant and service to one based on customers' electric usage. IIC also appeals the Commission's disparate treatment of the pure tax expense by removing it from existing rates to collect it through a rider as a pass-through tax line item on customers' bills. Isn't that what the legislature mandated in the new statute? No, sir. The legislature made no mandate in the tax law about how this tax should be allocated. The tax is under a different statute. It is not part of the Public Utilities Act, and it does not govern the Commission's rate-making authority. Well, then what does the language in General Assembly use pertaining to kilowatts per hour mean? They're referring to the tiered tax rate structure that is in the Act that our evidence showed in this case was intended to maintain the current, then current, level of the tax on each individual utility and the utilities as a group. In other words, they were going to pay essentially the same invested capital tax they were paying, and the legislature had to come up with a way to collect that amount, and they used the mechanics of the cents per kWh declining or inclining block rate. So our position is essentially that if you look beyond the sentence in the legislature that talks about the kWh rate, you will discover in our evidence showed, the empirical evidence showed, that roughly 83 percent, 77 percent, something like that, of the tax is related to the original invested capital tax, which is a function of plant and service, which was the basis for the original allocation. Now, IIC also has taken, you have asked us to address the objection made by the commission to that issue to our second appeal. We think that issue is largely mooted by the fact that nobody has objected to any of the issues we've raised on appeal. We only filed the second appeal to protect ourselves because the statute said you couldn't raise an issue that wasn't raised in an application committee hearing. You're talking about the 4110075 appeal. That's correct. Now, the commission's misallocation of the pure tax, which you asked me about before, and the commission's recovery method rest on a misinterpretation of the pure tax that I've just discussed with you a little bit. In 1997, the legislature restructured the electric utility industry. As a result, utilities were expected to transfer significant assets to The legislature preserved the amount of the 1997 tax on the invested capital and came up with a mechanism to recover same from customers, which is the tiered KWH rate. But the tax itself, the amount of expense paid by Ameren, the empirical evidence, nobody else put in empirical evidence to demonstrate what related to the tax, showed that 83% of this tax that Ameren is currently paying is related to the old invested capital tax, is a function of the old invested capital tax. And therefore, under cost of service principles, ordinarily filed by the commission, they would look at what is causing this cost to be occurred and they would allocate the cost among the customer classes on that basis. That's essentially what they failed to do because they looked at the act and they didn't look beyond the sentence in there that talked about tax on kilowatt hours delivered to really see what was behind the legislature's actions and what was the cause of the tax. Now, the Ameren... Well, isn't the question for us though whether the commission's decision regarding this issue is reasonable? I think under the cases that we cite in our brief, if the commission's actions were based on a misconception or misunderstanding of the law, you can remand the case to them with instructions that they consider the case again with a proper understanding of the law. So the issue here is really whether or not they understood the law correctly and whether that misunderstanding affected their ultimate decision. Well, it's the issue of whether or not the commission understood the law or whether or not the legislature understood what they were doing. I was going to say no comment, but I guess I'm on the hot seat here. I think the legislature, once you look into the history of this and there is testimony in the record and we describe this history in our brief and you look at the empirical evidence, it becomes clear what the legislature was doing. The mechanics, our structure for collecting this fixed amount of the tax that was going to be escalated by some inflation rate over time, the mechanics of that are not the issue here. The issue here was whether or not or what caused the tax or what causes the tax in the first instance. I can't speak for the General Assembly as to whether or not they knew what they were doing. Sometimes I think they do and sometimes I think they don't, not just on this issue but on other issues as well. I think we have to look at the facts in front of us in the case and the law in front of us in this case and make a determination. I've only got a little bit of time left. I actually covered most of the points I was going to make in the question that was raised in the very first instance by the court. So I think it would behoove me to surrender the rest of my time and sit down unless you have another question. Seeing none, thank you. Okay. Good morning, Your Honors. James E. Wagner, Special Assistant Attorney General on behalf of the Respondent of the Commerce Commission. Although IAC has given a concession about the second appeal, nonetheless I would ask the court to address it. The second appeal IAC took was, of course, based on a second application we were And, of course, it did take that under advisement in its March 24th order. The matter is of no small moment to the commission that a party is appearing before us. Does the commission have jurisdiction to grant a second application for re-hearing after the order on re-hearing under the facts before this court? For many years the circuit and appellate courts dealt with Supreme Court precedent allowing and even requiring second applications for re-hearing, but the Harrisonville Telephone decision overturned that precedent. Under subsection 10.113A of the Public Utilities Act, there is only one re-hearing on a commission case until the passage of at least two years and based on new and different state of facts. Since the commission held a re-hearing hearing and issued an order on re-hearing, it thereby exhausted its authority to grant re-hearings under the governing statute. We did not have jurisdiction to grant the second application for re-hearing. Therefore, 10.201A of the Act provides that the appeals must be taken in 35 days of the order on re-hearing. IEC's second appeal is well outside the statutory time frame. And I don't want to go too much into this, but the whole point of the application of re-hearing is for the commission to correct its mistakes. The party can list any issue of right and list it in there and get it either to the commission or if we deny it, take it to the court. If you can't grant it, it just ceases to function as an application for re-hearing. Like I said, the only issue we possibly identified that was not raised in the original application for re-hearing in IEC was the line itemization issue. Although they had opposed it during the case, they had not actually put it directly in. But of course, I think it's tied into the rider issue since we can only line itemize if we have a rider. With that, I will then turn to Ameren's appeal. Ameren argues that it was denied due process because the commission added the accumulated depreciation from the embedded test year rate base and added ADIT to the date of Ameren's pro forma capital additions, although Ameren's predecessors have had such accumulated depreciation adjustments made in the statute and that the commission abuses the discretion if it doesn't make the adjustments. Ameren's due process arguments are without merit. Counsel keeps relying on... You're saying Ameren had no reason to believe that ADR and ADIT would be treated as it was in this case based upon the commission past decisions and past court cases? Well, the only court case is the commonwealth debtors' decision overturning the cases they're relying on, well, at least directly overturning the last case they're relying on, but inherently overturning all the other cases where we did not do that. They may have had an expectation, but they themselves, their predecessors, in fact, in one case the commission imposed that on them. They didn't agree to it, we imposed it on them. So even if they keep ignoring that case and say, well, look at these other court cases, but there was that other case too, which gets me to a slightly different issue. Well, wasn't the commission taking the exact opposite position in a pending matter on appeal than it took as to Ameren's claims in this case? Yes. Precisely the same time, two different positions by the commission. Well, the commission had in the comment case not added the accumulated depreciation because of the pro forma capital adjustments and, of course, we were reversed. Counsel keeps talking about what the commission wanted to do and I would be great, but as it stands now, Illinois law says we don't have any discretion. I don't care what the commissioners. Now, we keep pointing to these four commission cases with decreasing majorities of commissioners agreeing with the position. We have the one case where we did the opposite. Yet there's all these other cases where the utility agreed, presumably with depreciation addition, which included another one of Illinois Power, another one of Ameren's predecessors. No one has ever found a case where the commission said on these agreed adjustments, wait a minute, that violates our rule in the statute. You can't do it. So essentially, I'm arguing here, they keep pointing to just one set of cases, but if you look at the totality of it, there was no consistent opinion before the commission. I would have a hard time determining why in one case staff came in and said you should do it and another state staff didn't. We know that four cases the commission refused to do it where the utility didn't agree and we have one case where the utility was opposed on the utility even though they didn't agree. They're looking at these cases and what really kind of turns the issue is the ComEd decision, which overturned us all together. Council refers to the BPI case when they make their 10-1-1 argument, but they Supreme Court said the commission could have set a new standard procedure through an order. The court did talk about changing the rule, but take a look at the rule we're talking about. The rule doesn't say anything about accumulated depreciation. It just says that known and measurable change. The rule itself never excluded or included almost anything. It just says that anything allowed has to be a known and measurable change. And the edit are known and measurable changes. I disagree with Council excessively that res judicata does not apply to the commission. Even the Mississippi original case said that the fact that the commission has ruled in a particular way does not bother the commission from doing something different or changing its mind about it. There is no res judicata. And they keep trying to say, well, that these four cases, one of which was explicitly overturned, bound the commission to continue doing the same thing unless we go through a whole rulemaking procedures and do something else. What can we expect regarding some level of predictability about the future? Is there none? Well, since the issue was a ComEd case in the most recent ComEd rate decision, we have made the accumulated depreciation an added adjustment in that case. That case is now pending appeal in the first district. We haven't briefed it yet. So as far as I know, since the ComEd decision by the second district, we have been consistently in every case adding the accumulated depreciation and also the added. The real issue, as I see it, though, is the commission's authority. When the commission suspends a proposed rate care utility, the termination of the just and reasonable rates becomes the commission's duty under 9201C. That duty requires us to find the just and reasonable amounts, including the just and reasonable amount of rate base. Accepting Ameren's arguments that the commission should be stopped from making the two base rate adjustments that the commission determined were necessary denies the public the commission's authority to set Ameren's just and reasonable rates under the statute. And we ask that Ameren's arguments be rejected. Turning to IIC's appeal. IIC keeps talking about prior commission decisions and what Ameren did in the past, but they're really talking about application. After the new pure tax was passed, ComEd changed how it assessed the pure tax to its customers by using a kilowatt per hour basis. Ameren's predecessors did not. So assuming, for sake of argument, that the statute would allow either result, the commission has decided that the result we want is to assess it by the kilowatt hours. Thus, IIC has a tremendous burden to prove that the only result allowable under the statute is to continue assessing on the basis of the former generation plant that these utilities no longer own to assess the tax, the pure tax, to its customer classes. The commission, in its final order, adopted the staff and the Ameren position that the assessment should be made on a kilowatt hour basis. Testimony was submitted on that point. It has to do with cost causation. And while the commission did not issue a specific cost subsidization finding, staff had showed evidence that were DS4 customers, they were paying far less than their fair share of the pure tax. They had much more electricity delivered to them than their tax would indicate. And similarly, the residentials were paying far more pure tax than they actually get in delivery of electricity. And I think that's sufficient cost causation to show for the commission to have adopted a kilowatt per hour use of the pure tax. This really has to do, it does not have to do with interpretation and tax. It really has to do with application to the rates, which is something that is delegated to the commission's jurisdiction. We note that the pure tax overall, the general assembly wanted to keep the nothing in the pure tax to talk about generation plant. And essentially, I had this argument, I'll throw out for what it's worth. The former plant investment tax was essentially a square peg in a square hole. The general assembly changed the pure tax to a round hole measuring delivery of kilowatt hours. IAC keeps saying, well, we got the square peg and we could jam it into the whatever percentage is, but the answer is why are you doing it? There's nothing to do with generation plant anymore. It was the total amount of tax revenues collected that the general assembly wanted. It didn't really care, and it changed the system on how its assessment of pure tax so dramatically that what the commission did is just and reasonable and should be affirmed. And unless the court has further questions, I will sit down. Thank you. Thank you, counsel. Back to Mr. Witt. OK, where are we on the time allocation here? Is this our last argument or is there some further rebuttal from either of you? Mr. All right, well, I'm not that good at math, so I assume you got us on the right page. Go ahead, counsel. Thank you, your honor. Imagine that you're in a football game and you go to take the line on the fourth down and the referee blows a whistle and says, hold on, we've decided you only get three downs now. I guess IAC would say that's OK to change the rules in the middle of the game. The other side, they still get fourth down, but that's because their jerseys are a different color or something. There's a fundamental violation of due process when rules are changed after the fact instead of giving parties notice. There was no notice of the change here. The 2003 case that the commission counsel referred to was an Ameren case that in four subsequent cases the commission distinguished because of the peculiar facts of that case. It had to do with declining investment levels, which didn't happen and wasn't at issue in the subsequent four cases, wasn't an issue in our case either. So when we talk about the universe of cases that exist, I think we need to focus on what's happened in the past decade. In the past decade, the treatment has been consistent. Whenever this was a disputed issue, the commission said we are not going to make the adjustment and, in fact, to do so would violate our rules. We're now told by the commission we must make the adjustment because Illinois law requires it. Now, with respect to the Commonwealth Medicine appellate decision, that decision is wrong really for two reasons. Number one, it misinterprets Well, before you get to why it is wrong, you do acknowledge that the commission at this juncture has to follow what the second district said. As of this time, they do. But certainly this court isn't bound by that decision. We think the decision should be reversed, and this court can distinguish that decision on two bases. Number one, the misinterpretation of 9-11. It does not require the adjustment. Number two, the second district basically substituted its judgment for the commission's on the issue of what the appropriate accounting is. The court basically said, well, we think we know better than the commission what its own rule means, so we're going to change it. So we would ask this court to reverse the commission. We understand that creates a conflict among the circuits that would ultimately be resolved by the Illinois Supreme Court, and there's nothing wrong with that. With respect to the statement that the public would be deprived of just and reasonable rates if this adjustment doesn't stand, by definition, rates that are enacted or commission action that is unlawful cannot result in just and reasonable rates for anybody. With respect to the pure tax issue, the only thing I really have to say about that is the allocation of this pure tax is an issue of rate design, and if there's any area where the commission has very broad discretion, it's in rate design. There's no such thing as a correct rate design, and the issue here isn't whether the commission, based on the evidence, made the best possible decision on what the best allocation is. That's not the issue. The issue is, is the commission decision, is there evidence for it, is it otherwise unlawful? That's a test it has to pass. It's not a high hurdle, and it's been met here. If there are no questions, I will be seated. Thank you. Okay. I guess we're, excuse me. There's a, I guess where I'm supposed to be responding to Ameren's original position with regard to the treatment of depreciation. And let me suggest that Section 9-211 does refer to value. It's part of the sentence. When you read the sentence that makes up that section, the word value is in there. It is not without meaning. And that term, value, value of the assets, really is referring to the components of the rate base, which are made up of dollars. And it says that you can get the value of your rate base that is in, that is prudently incurred and used and useful. And if it's not, then you can't recover that. But the key to it is value. And it was the second district appellate court that focused on that word and said, essentially, it's not without meaning. We think the value they're referring to is original cost, less depreciation. And when the commission determines that value, it has to match the depreciation with the rate base determination over the same period, whether that's 12 months or 18 months if there's going to be pro forma capital additions. The commission's rule permitted those adjustments. And that's also what distinguishes this case from the BPI case. We have a rule here that the commission was following. Now, did it follow it consistently? Probably not. But the commission was following a rule. It was allowing pro forma adjustments. And the real question is, if you're going to make a pro forma adjustment for a capital addition after the end of the test year, do you also have to make corresponding adjustments for accumulated depreciation? The answer is yes, you do. And that's essentially what the second district determined. So, in any event, also this idea of notice is a little confusing to me because this is more like an argument that Ambren would be making if they had been subject to a rulemaking or some other proceeding in front of the commission where the rule was applied to them and there had been no notice given to them at all. As a practical matter, in a rate case, they make their filing. The issues that are governed in a rate case are governed by the utilities initial filing and the direct testimony that's filed by the other parties. At the very beginning of this case, direct testimony was filed by IAC, the Attorney General, and I think by the commission staff that raised this very issue that Ambren now says, gee whiz, we didn't get any notice of this. They sure did get notice. They participated in a cross-examination. They presented testimony in response. They briefed it. They got an application for a rehearing filed, and they got a rehearing on the issue. It's a little hard to say that this particular utility did not have proper notice that this was going to be an issue in the case, and given the holding in Mississippi, and given the fact that in their own prior successor companies were in a case where this rule was specifically applied to them. I call it the balanced approach to the depreciation adjustment. The balanced approach was specifically applied to them over their objection, so it's hard for me to understand how they can stand up and say, gee whiz, we didn't know this might happen. They had plenty of notice. They had a chance to litigate it. They're continuing that opportunity to litigate it in front of you, or at least on appeal, and I don't see where 10-101 controls this at all. 9-210 does deal with value. It uses the term value, and traditionally when the commission determines that value, they look at original cost, less depreciation, and the very next session, the legislature used the term value again. That's what they meant, original cost, less depreciation, and that's what that statute was addressing, what the utility could include in its rate base, and so I see my time is up. I'll sit down. Thank you, sir. Thank you. Thank you, Your Honors. Section 9-211 does have the word value in it, but if the statute means what the commission and IIEC say it means, it begs the question, well, what does 9-210 mean? I don't know and haven't heard an explanation yet. IEC says that the commission was following a rule. Well, which version of it? The one that applied before our case or after the order? That's the problem here. It's a different version of the rule that they applied in our case, as to other cases. With respect to notice, sure, other parties filed testimony indicating they wanted to make this adjustment again, but there was no notice from the commission that it had any intention of changing its rule. What the commission could have done and should have done to reach the result that it did is, when it saw that the filing had been made, that AMR proposed this adjustment, that it wanted to treat the issue differently, it could have issued notice early in the proceeding indicating, we see that AMR is requesting this adjustment, parties are on notice that we expect to see evidence of A, B, and C, because we may be reevaluating this, and then everyone could have acted accordingly. That didn't happen. The standard of review here, under 10-201, requires reversal where the order or the proceeding or manner in which it was issued violates Illinois law. The proceeding and manner in which this order was issued does, and the order should be reversed. Thank you. The commission has argued that this is part of their, it's a choice they make in setting rates, and if they could do it one way in ComEd, they could do it another way in AMR, and I don't disagree with that basic fundamental idea of rate making. However, in this particular case, their decision to do this was based on their misinterpretation of the act, and secondly, it also ignored the empirical evidence presented by IIC that demonstrated, and there was no such evidence present in the AMR case, because I was in that, or the ComEd case, I was in that case, that suggested that this tax was not exclusively a function of KWH delivered, and the commission allocation method adopted in this case assumes that it is. So there's two problems. Number one, they acted on the basis of a misinterpretation of law, and number two, they ignored the empirical evidence in the record that KWH delivered, which is what their allocation assumed, and which is the basis for their order. There's no evidence to support that in the record. Thank you. Thank you, counsel. Does that conclude the arguments? I'm only going to respond to that. Okay. Any questions from the court? Seeing none, thanks to all of you. The case is submitted, and the court will stand in recess.